UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GENARO GARCIA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:20-cv-00203-TWP-MPB |
| ) | |
| SAMUEL BYRD, MD, Doctor, BOBBIE RIGGS, ) | |
| RN, Nurse, and WEXFORD OF INDIANA, LLC ) | |
| ) | |
| Defendants. ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross motions for summary judgment. Plaintiff Genaro Garcia ("Mr. Garcia"), an Indiana Department of Correction inmate, filed this action pursuant to 42 U.S.C. § 1983. He alleges that defendants Samuel Byrd, M.D. ("Dr. Byrd") and Barbara Riggs[1], RN ("Nurse Riggs") denied him treatment for his serious medical condition. (Dkt. 7 at 2-3.) He also alleges that Wexford of Indiana, LLC ("Wexford") maintains a policy or practice of failing to prescribe him medication and failing to refer him for specialized treatment to cut costs. *Id.* Mr. Garcia moved for summary judgment (Dkt. 40), thereafter, Dr. Byrd, Nurse Riggs and Wexford (collectively the "Defendants") filed for summary judgment (Dkt. 43). For reasons explained below, the Defendants' motion is **granted**, and Mr. Garcia's motion is **denied**.

### I. LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

---

[1] Nurse Riggs' first name is Barbara (Dkt. 45-1) and she is incorrectly identified as Bobbie Riggs by the Plaintiff. The **Clerk is directed** to correct the docket.

as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. Am. Airlines Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th

Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and need not "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II. **MATERIAL FACTS**

The Defendants argue that Mr. Garcia's Motion for summary judgment does not include a statement of material facts, any authority, or evidence, and no response can be provided. (Dkt. 47 at 1, 2.) They contend that Mr. Garcia's Motion "simply makes unsupported allegations similar to his complaint[.]" *Id.* at 2. The Court agrees and finds that Mr. Garcia's motion merely restates his allegations against the Defendants without supporting evidence. This does not comport with summary judgment procedure. *See* S.D. Ind. L.R. 56-1. And, the Seventh Circuit has "repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360

(7th Cir. 2008). Here, the Court enforces Local Rule 56-1 by disregarding the unsupported factual assertions in Mr. Garcia's Motion when stating the factual background in this case.

**A.      Mr. Garcia's Medical History**

In 1990, Mr. Garcia injured his leg in a motor vehicle accident. (Dkt. 45-3 at 8.) Prior to Mr. Garcia's incarceration, he was enrolled in a pain management clinic that prescribed narcotics for his condition. *Id.* at 7. Since his accident, Mr. Garcia's leg pain has been "consistent," and his leg has gotten smaller. *Id.* at 8-9. In addition, his ankle has begun to twist when he walks, which causes more pain. *Id.* at 9.

Mr. Garcia has been an inmate incarcerated at Wabash Valley Correctional Facility since 2016. (Dkt. 45-3 at 3.) The Defendants do not dispute that Mr. Garcia "has a medical history positive for ongoing neuropathy with complaints of leg pain, as well as 'withered leg' syndrome that results in a small gait disturbance" that caused Mr. Garcia to walk slowly. (Dkt. 45-2, ¶ 4.) Mr. Garcia was prescribed pain medication and was "encouraged to be active as much as possible, to strengthen the lower extremity and decrease the progression of this 'withered' leg." *Id.*

Mr. Garcia filed numerous healthcare request forms that were the same or similar because he was in daily pain. (Dkt. 45-3 at 11.) On February 14, 2018, he was put on a care plan pursuant to Healthcare Services Directives 2.04. (Dkt. 45-2, ¶ 8; Dkt. 45-4 at 124-27.) This directive allows the institution to implement a care plan for patients who abuse the system of submitting written healthcare request forms for medical treatment. (Dkt. 45-2, ¶ 9.) "Most often, this would involve a patient with a chronic medical condition, and the agreement and plan is that the individual will be seen no more than once per month, unless there is a change in the patient's condition" to require a visit sooner. *Id.*

**B.      Mr. Garcia's Medical Interactions**

### 1. **Dr. Byrd**

Dr. Byrd is a physician licensed to practice medicine in the State of Indiana and was employed by Wexford during the times relevant to Mr. Garcia's complaint. (Dkt. 45-2, ¶¶ 1-2.) He first examined Mr. Garcia on August 1, 2017 through a chronic care visit for management of ongoing hepatitis, neuropathy and his withered leg. *Id.*, ¶ 5; Dkt. 45-4 at 137-40. Dr. Byrd noticed "atrophy to the lower left extremity," and noted that Mr. Garcia was taking Neurontin, "an antiepileptic medication that can also be used for treatment of chronic pain." (Dkt. 45-2, ¶ 5; Dkt. 45-4 at 134-40.) Dr. Byrd increased Mr. Garcia's prescription of Neurontin from 2 to 3 times per day, and also ordered that his Neurontin level be tested the next time he received a blood draw. This is designed to ensure compliance, as Neurontin is a highly trafficked and abused medication in the world of corrections, and in the general medical community. *Id.* After this appointment, another physician at Wabash took over Mr. Garcia's care. (Dkt. 45-2, ¶ 5.)

While under the care of another provider, Mr. Garcia received additional pain medications, received x-rays, and was referred to physical therapy. *Id.*, ¶ 6; Dkt. 45-4 at 129-40. His prescription for Neurontin was tapered and discontinued on February 14, 2018. (Dkt. 45-2, ¶ 8; Dkt. 124-27.) At this time, Mr. Garcia's care plan was put in place. *Id.* Though Dr. Byrd was not involved in this process, he believes the care plan was appropriate due to Mr. Garcia's numerous and identical healthcare requests that "did not represent any change in his medical condition." (Dkt. 45-2, ¶ 10.) After his care plan was set, Mr. Garcia was evaluated by a physical therapist and given home exercises, tried additional pain medications, and was referred to a specialist for "an ankle orthosis and special orthopedic shoes for his withered leg and ankle discomfort." *Id.*, ¶¶ 11-17; Dkt. 45-4 at 87-90, 93-97, 100-05, 110-14, 115-16, 122-23.

On October 9, 2018, Dr. Byrd saw Mr. Garcia for the second time. (Dkt. 45-2, ¶ 18; Dkt. 45-4 at 75-77.) At this time, Mr. Garcia was awaiting a final fitting for his orthosis and shoes, and he had an active prescription for Keppra for pain. *Id.* Mr. Garcia expressed frustration that the other doctor was "denying [him] pain medication", despite the fact that records show ongoing prescriptions of pain medication. They discussed his history of withered leg and Dr. Byrd told Mr. Garcia that he had no doubt he has chronic pain. *Id.* Mr. Garcia requested that Neurontin be reinstated in place of Keppra, but he agreed to try Depakote, which Dr. Byrd then prescribed. *Id.*

Dr. Byrd did not see Mr. Garcia again for his leg until December 11, 2018. (Dkt. 45-2, ¶ 20; Dkt. 45-4 at 63-66.) Again, Mr. Garcia sought an alternative pain medicine, and this time Dr. Byrd prescribed Effexor 150 mg. *Id.* Thereafter, Mr. Garcia's care was again transferred to a different provider at Wabash. (Dkt. 45-2, ¶¶ 21-22.)

Dr. Byrd did not see Mr. Garcia until September 17, 2019, for a chronic care visit. *Id.*, ¶ 23; Dkt. 45-4 at 15-21. He noted that Mr. Garcia had "a leather ankle foot orthosis with an ankle stabilizer and orthopedic shoes", and that Mr. Garcia reported that the effectiveness of Effexor had decreased. (Dkt. 45-2, ¶ 23; Dkt. 45-4 at 15-21.) Dr. Byrd prescribed a combination of anti-inflammatory, Meloxicam and Tylenol, as an alternative and referred Mr. Garcia back to orthotics to check his fittings. (Dkt. 45-2, ¶¶ 23-25; Dkt. 45-4 at 15-21.) By November 12, 2019, Mr. Garcia was referred to the orthotics Hangar Clinic, and Dr. Byrd continued the Tylenol prescription but discontinued Meloxicam because Mr. Garcia did not believe it was helping him. (Dkt. 45-2, ¶¶ 25-26; Dkt. 45-4 at 9-12.)

By December 30, 2019, Mr. Garcia was provided a custom ankle/foot orthosis, extra depth shoes, and three pairs of AFO socks to wear with his brace after being seen at the Hangar Clinic. (Dkt. 45-2, ¶ 27; Dkt. 45-4 at 7-8.) Though Mr. Garcia asserts he did not "refuse" to see Dr. Byrd

6

on his next chronic care visit on February 4, 2020, it is undisputed that Dr. Byrd did not see him on this date. (Dkt. 45-2, ¶ 28; Dkt. 45-3 at 16-17; Dkt. 45-4 at 5-6.) Beyond that date, Mr. Garcia saw another provider. (Dkt. 45-2, ¶ 29.)

Mr. Garcia testified that he is suing Dr. Byrd because he did not listen to his medical complaints, did not issue a medical lay-in to prevent him from having to walk to the chow hall in pain, and did not give him proper pain medication. (Dkt. 45-3 at 6.) Dr. Byrd attested that though Mr. Garcia "had a withered leg with decreased muscle atrophy and some ankle instability," he believed that it was in Mr. Garcia's "best interest" to walk as much as possible, even if it caused him some level of discomfort. (Dkt. 45-2, ¶ 34.) Dr. Byrd attested that Mr. Garcia was overweight and that less movement with a medical lay-in could cause him further muscle atrophy, "which would not only result in a decreased physical ability to ambulate but could result in increased chronic pain." *Id.*, ¶ 35. Dr. Byrd based this decision on Mr. Garcia's continued ability to ambulate, his continued prescriptions of pain medication, and his provision of an ankle/foot orthosis and orthopedic shoes, as these tools helped him ambulate. *Id.* Dr. Byrd attested that all pain medication Mr. Garcia was prescribed was FDA approved. *Id.*, ¶ 32.

As of the date of his deposition on November 23, 2020, Mr. Garcia had received a medical lay-in from another provider, Dr. Rajoli. (Dkt. 45-3 at 4-5.) The medical lay-in was issued for a six-month period. *Id.*

### 2. <u>Nurse Riggs</u>

Nurse Riggs is a registered nurse licensed in the State of Indiana and was employed by Wexford during the allegations in Mr. Garcia's complaint. (Dkt. 45-1, ¶¶ 1-2.) Her job duties included reviewing healthcare request forms, performing nurse sick calls, and determining the appropriate response to an inmate's medical issue, be that written response, a nurse sick call visit, or evaluation from a provider. *Id.*, ¶ 3.

Nurse Riggs did not have "unilateral authority to initiate a care plan," and did not participate in setting Mr. Garcia's care plan. *Id.*, ¶ 5. However, she would schedule patients, like Mr. Garcia, pursuant to the care plan. *Id.*

Nurse Riggs saw Mr. Garcia on February 9, 2018, for back pain, and noted that he had recently seen a provider about a similar issue and was scheduled for physical therapy. *Id.*, ¶ 7; Dkt. 45-4 at 128. The next week, Mr. Garcia's care plan was implemented, and he was not to be scheduled "more often than once per month to be seen in nurse sick call, unless circumstances or complaints were significantly different." Dkt. 45-1, ¶ 8. "The care plan specifically stated that [Nurse Riggs], or another nurse on sick call, was to triage the healthcare request forms and notify the physician as [was] appropriate." *Id.*

Nurse Riggs saw Mr. Garcia on March 8, 2018, noted that he ambulated without difficulty, and documented that he reported that nothing had changed. *Id.*, ¶ 10; Dkt. 45-4 at 120-21. Nurse Riggs reviewed his care plan with him, noted that he only wanted Neurontin for his pain, and noted that he had a recent evaluation from physical therapy and a home exercise plan. (Dkt. 45-1, ¶ 10; Dkt. 45-4 at 120-21.)

She saw Mr. Garcia again on April 16, 2018, for leg pain and pain in the right ankle, and she referred him to a provider because he had not been recently seen by a doctor. (Dkt. 45-1, ¶ 11;

8

Dkt. 45-4 at 117-19.)  Nurse Riggs did not see Mr. Garcia for his leg condition again until June 18, 2018, and he reported his pain medication was not working. (Dkt. 45-1, ¶ 17; Dkt. 45-4 at 98.) At this time, Mr. Garcia was on Trileptal and said he was only going to try it for a week, but Nurse Riggs advised him to make a "good-faith effort" to continue to take it. *Id.* Nurse Riggs noted he was able to ambulate without difficulty and was in no distress during the visit. *Id.*

On July 17, 2018, Nurse Riggs saw Mr. Garcia for leg pain, but he stated nothing had changed with his condition. (Dkt. 45-1, ¶ 20; Dkt. 45-4 at 91-92.) She noted that he ambulated without difficulty, was able to bend and climb onto the examination table, and he had been recently seen at the Hangar Clinic for an approved ankle orthosis and orthopedic shoes. *Id.*

A month later, Mr. Garcia returned complaining of pain and requested a medical lay-in. (Dkt. 45-1, ¶ 22; Dkt. 45-4 at 85-86.) Nurse Riggs reiterated the benefits of walking and Mr. Garcia's recent weight loss, noted that he said nothing had changed, and advised him she would update the doctor. *Id.*

Though Nurse Riggs saw Mr. Garcia for other unrelated complaints in the fall of 2018, she did not see him regarding his leg until November 26, 2018.  (Dkt. 45-1, ¶¶ 23-28; Dkt. 45-4 at 69-70.)  He had a follow up visit with the Hangar Clinic and reported that he "was pleased with the fit and function of the orthosis and the shoes."  (Dkt. 45-1, ¶ 28; Dkt. 45-4 at 69-70.)

On December 7, 2018, Mr. Garcia complained that his orthopedic shoes were "too big," and Nurse Riggs called the Hangar Clinic for further instructions. (Dkt. 45-1, ¶ 29; Dkt. 45-4 at 67-68.)  Mr. Garcia's shoes were "fit to accommodate the ankle brace" and would be "larger without the brace," and so he was instructed to continue to wear the brace and the shoes together, as was designed.  *Id.*

Nurse Riggs saw Mr. Garcia on January 15, 2019, regarding the status of a medical lay-in. (Dkt. 45-1, ¶ 31; Dkt. 45-4 at 61-62.) But, a medical order for a lay-in had not been given by any provider. *Id.* Nurse Riggs noted that Mr. Garcia was not wearing his brace and shoes as instructed, and she advised him to wear his orthotics when walking. *Id.* A week later, Mr. Garcia stated that his pain medication was not working, and Nurse Riggs notified the doctor. (Dkt. 45-1, ¶ 32; Dkt. 45-4 at 57-60.) Mr. Garcia's Effexor was then increased. *Id.*

On February 7, 2019, Mr. Garcia complained that he slipped on the floor and thought his knee gave out. (Dkt. 45-1, ¶ 33; Dkt. 45-4 at 54-56.) Nurse Riggs examined him, noted no sign of injury, and noted he walked to the infirmary. (Dkt. 45-1, ¶ 33, Dkt. 45-4 at 54-56.) She offered him Tylenol for pain, but he refused because he wanted Neurontin, which she "did not have the authority to offer." *Id.* Due to no significant injury, Nurse Riggs gave Mr. Garcia a home exercise plan to stretch his knee. *Id.*

Mr. Garcia requested a new housing assignment or medical lay-in on February 27, 2019, but Nurse Riggs informed him there was no order for a lay-in because he did not meet criteria for one at that time. (Dkt. 45-1, ¶ 34; Dkt. 45-4 at 52-53.) He was not able to be transferred to another area of Wabash because there were security issues with offenders in that area. *Id.* Nurse Riggs noted that Mr. Garcia was able to ambulate without difficulty and was able to get onto and off the examination table. *Id.* Between April and July 2019, Mr. Garcia missed an appointment with Nurse Riggs, and the other times that he saw Nurse Riggs were for unrelated medical issues. (Dkt. 45-1, ¶¶ 37-40, 42-44.)

Mr. Garcia testified that he is suing Nurse Riggs because she blocked him from seeing the doctor, and he did not see a doctor for over a year. (Dkt. 45-3 at 9.)

10

### C. Wexford Claims

Mr. Garcia testified that he was suing Wexford because they were "responsible for their medical staff," in this case Dr. Byrd and Nurse Riggs, and his medical complaints were being ignored. *Id.* at 12-13.

### III. DISCUSSION

At all times relevant to Mr. Garcia's claims, he was a convicted inmate. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

Mr. Garcia does not have a constitutional right to demand specific medications or treatment. *Arnett v. Webster,* 658 F.3d 742, 754 (7th Cir. 2011) ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm."). Instead, "[a] medical professional is entitled to a deference in treatment decisions unless no minimally competent professional would have [recommended the same] under the circumstances." *Pyles*, 771 F.3d at

11

409. "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

The Defendants do not dispute that Mr. Garcia's condition was an objectively serious medical need. Rather, they dispute whether they were deliberately indifferent. Accordingly, the Court will address the second prong of the deliberate indifference analysis as it pertains to each Defendant, in turn.

**A.     Dr. Byrd**

The crux of Mr. Garcia's argument is that Dr. Byrd did not provide him with a medical lay-in and did not prescribe him proper medication for pain—specifically, he was prescribed seizure medication and not pain medication. (Dkt. 45-3 at 6.)  However, Mr. Garcia is not entitled to specific care such as a lay-in pass or specific prescription drugs, or even to receive the best care possible.

**1.     Medical Lay-in**

Dr. Byrd's professional opinion was that Mr. Garcia needed to maintain mobility to reduce further atrophy of his leg, and a medical lay-in was not the best approach to attain this goal.  Simply because Mr. Garcia later received a medical lay-in from another provider, does not establish that Dr. Byrd was deliberately indifferent to his medical condition.  "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising professional judgment." *Pyles*, 771 F.3d at 409.  Further, disagreement between medical professionals is not enough to establish an Eighth Amendment violation.  *Id.*

The Court defers to Dr. Byrd's decision not to order a medical lay-in "unless no minimally competent professional would have so responded under those circumstances," because "there is no single proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (internal quotation marks and citations omitted). Also, the Court examines the totality of Mr. Garcia's medical care when evaluating whether Dr. Byrd was deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018). Deliberate indifference "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources*, 982 F.3d 451, 458 (7th Cir. 2021) (internal quotations omitted).

Dr. Byrd saw Mr. Garcia a handful of times for his leg and ankle, and Mr. Garcia had received treatment from other Wabash providers. Dr. Byrd was aware that Mr. Garcia had received x-rays, been evaluated by a physical therapist, received a home exercise plan, tried a regime of pain medications, many of which Dr. Byrd prescribed, and was referred to the Hangar Clinic for a custom ankle/foot orthosis and special orthopedic shoes. (Dkt. 45-2, ¶¶ 6, 11, 16, 18, 24-25, 27, 35.) The medical records indicate that Mr. Garcia was still able to ambulate, and Dr. Byrd found that the tools he received would help "ensure that he had every opportunity to move as much as possible, decrease his weight, and continue to maintain his level of ambulation." *Id.*, ¶ 35. Dr. Byrd was concerned that decreased mobility would further decondition Mr. Garcia's leg and would result in increased muscle atrophy that would decrease his ability to ambulate as a whole and could increase his already chronic pain. *Id.* Further, the provider who did go on to order a medical lay-in in September 2020 only did so after treating Mr. Garcia multiple times, and he noted that he was able to walk "an unlimited distance." (Dkt. 45-4 at 1 (April 21, 2020 chronic care visit).)

Though Mr. Garcia testified he experienced pain walking, Dr. Byrd's medical opinion was that attempts to walk, even though they may cause some discomfort, were better for his degenerative condition. Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient to state a deliberate indifferent claim. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Johnson v. Doughtry*, 433 F.3d 1001, 1013 (7th Cir. 2006). Mr. Garcia has presented no evidence, other than his own disagreement with the treatment approach, to support his contention that Dr. Byrd's decision not to order a medical lay-in sooner was deliberately indifferent.

### 2. **Pain Medication**

Mr. Garcia's argument that Dr. Byrd did not prescribe proper medication for his condition is unpersuasive. To the extent that Mr. Garcia believed he should have continued Neurontin, he is not entitled to demand specific care of a specific drug. Further, Dr. Byrd did continue his existing prescription for Neurontin during his initial chronic care visit with Mr. Garcia. (Dkt. 45-2, ¶ 5.) Indeed, Dr. Byrd increased the dosage. *Id.* Mr. Garcia testified that he told the doctors the Neurontin "was not really working," that it upset his stomach, and caused side effects of headaches. (Dkt. 45-3 at 6.) Another provider tapered Mr. Garcia off this medication before it was discontinued, and Mr. Garcia was given multiple alternatives. (Dkt. 45-2, ¶ 8.) Dr. Byrd attested that "Neurontin is a highly trafficked and abused medication in the world of corrections, and in the general medical community." *Id.*, ¶ 5. Because Mr. Garcia reported that it was not beneficial and because it is "a potentially habit-forming substance with history of diversion and misused," Dr. Byrd did not believe it appropriate to prescribe when there were other options to treat chronic neuropathy. *Id.*, ¶ 33.

14

On subsequent visits when Mr. Garcia requested alternative pain medication, Dr. Byrd prescribed Depakote, Effexor, increased doses of Effexor, a combination of Meloxicam and Tylenol, and continued Tylenol after Mr. Garcia reported Meloxicam was ineffective. It is evident from the medical records that Dr. Byrd did not ignore Mr. Garcia's requests for pain medication. Mr. Garcia testified that he kept receiving "seizure medication and psych medication to manipulate [his] brain to think that [he wasn't] in pain." (Dkt. 45-3 at 6.) To the extent that Mr. Garcia argues that these medications were somehow improper for his condition, Dr. Byrd attested all medication administered to Mr. Garcia was FDA approved. (Dkt. 45-2, ¶ 32.) In fact, Mr. Garcia's initial medication, Neurontin, is a seizure medication. Dr. Byrd also discussed with Mr. Garcia the use of serotonin and norepinephrine reuptake inhibitors ("SNRIs"), such as Effexor, in the treatment of chronic pain to "combat pain impulses as they travel through the spinal cord." (Dkt. 45-4 at 65.)

Mr. Garcia has presented no evidence, other than his own disagreement with the treatment approach, to support his contention that the medication Dr. Byrd prescribed was inappropriate.

Because no reasonable juror could find that Dr. Byrd was deliberately indifferent to Mr. Garcia's medical needs, Dr. Byrd is entitled to summary judgment as a matter of law.

**B.    Nurse Riggs**

Mr. Garcia testified that Nurse Riggs prevented him from seeing a doctor, and he believed he had not seen a doctor for over one year. (Dkt. 45-3 at 9.) It is undisputed that Mr. Garcia was placed on a care plan due to his submissions of multiple healthcare request forms that were for similar issues regarding his degenerative condition. And it is undisputed that Nurse Riggs was not responsible for his placement on this care plan but was responsible for scheduling him pursuant to the orders of the plan. (Dkt. 45-1, ¶ 5.) She attested that when a patient has a care plan, she compares the patient's healthcare to his previous complaints "to determine if there is any significant

15

change or a new symptom that may impact the physician's treatment plan, such that a referral was necessary." *Id.*, ¶ 9. If the complaints were consistent with previous ones, the patient would be scheduled for a visit in accordance with the care plan. *Id.*

The medical records indicate that Nurse Riggs saw Mr. Garcia numerous times, sometimes for issues related to his leg and ankle, and others that were unrelated. During this lengthy interaction history, Mr. Garcia told Nurse Riggs that his condition had not changed, and she observed that he could continuously ambulate without distress. In her initial visit with him in February 2018, Mr. Garcia had already seen a provider and was scheduled for physical therapy. (Dkt. 45-1, ¶ 7.) In March 2018, Mr. Garcia had returned from the physical therapy evaluation and was given home exercises. *Id.*, ¶ 10. In April 2018, when Mr. Garcia presented with a new symptom of right ankle pain when he walked, Nurse Riggs referred him to a provider because he had not seen a doctor for a couple of months. *Id.*, ¶ 11. In June 2018, Mr. Garcia told Nurse Riggs he was only giving his medication "a week to work," and she advised him to make an effort to continue to allow it work, noting that he was ambulating without difficulty. *Id.*, ¶ 17. In July 2018, Nurse Riggs noted that while Mr. Garcia again reported pain, he could walk to the infirmary without difficulty, could bend and climb up onto the table for an examination, and was recently assessed for his approved orthosis and orthopedic shoes. *Id.*, ¶ 20. He was seen by a doctor just a week after this visit. *Id.*, ¶ 21. In August 2018, Nurse Riggs advised Mr. Garcia that there were no orders for a medical lay-in, but that she would update the doctor, even though he told her nothing had changed with his condition. *Id.*, ¶ 22. In November 2018, Mr. Garcia informed Nurse Riggs he was pleased with the fit and function of his orthosis and shoes, and he was advised to follow-up if needed. *Id.*, ¶ 28. When Mr. Garcia returned in December 2018 because the fit was

"too big," Nurse Riggs called the Hangar Clinic for further instruction, and based on the response she received, instructed Mr. Garcia to wear his brace and the shoes together. *Id.*, ¶ 29.

Nurse Riggs continued to interact with Mr. Garcia the following year addressing his concerns. In January 2019, she again told him that the provider had not ordered a medical lay-in and continued to advise him to wear his custom shoes and braces, which he was not doing at the appointment . *Id.*, ¶ 31. When he reported that his pain medication was not working, Nurse Riggs contacted the doctor, and Mr. Garcia's dosage was increased as a direct result. *Id.*, ¶ 32. Beyond February 27, 2019, when Nurse Riggs again advised Mr. Garcia that the doctor had not authorized a medical lay-in and that he could not transfer to another location due to security, Nurse Riggs saw Mr. Garcia for issues unrelated to his leg. *Id.*, ¶ 34, 37-40, 42-44.

The medical records do not indicate that there was ever a one-year gap in which Mr. Garcia did not see a provider. (Dkt. 45-4.) Mr. Garcia's medical records beginning in late 2017 show that he was seen twice by providers; he was seen 10 times in 2018, 5 times in 2019, and 2 times in early 2020. Nurse Riggs' last interaction with Mr. Garcia was in July 2019. (Dkt. 45-1, ¶¶ 43-44.)

Mr. Garcia has presented no evidence that Nurse Riggs unreasonably denied him access to a provider. Rather, the record indicates that Nurse Riggs referred Mr. Garcia to a provider in accordance with this established care plan and that he had ample access to medical treatment for his chronic condition.

Because no reasonable juror could find that Nurse Riggs was deliberately indifferent to Mr. Garcia's medical needs, she is entitled to summary judgment as a matter of law.

### C.     **Wexford Policy Claims**

Mr. Garcia testified that he is suing Wexford because the entity is responsible for its employees, Dr. Byrd and Nurse Riggs. (Dkt. 45-3 at 13.) Wexford is "treated the same as a

17

municipality for liability purposes under § 1983." *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (holding that a corporation that contracted with a jail to provide health services is "treated the same as municipalities for liability purposes in a § 1983 action"). Wexford "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of respondeat superior for constitutional violations committed by [its] employees." *Simpson v. Brown Cty.*, 860 F.3d 1001, 1005-06 (7th Cir. 2017) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)). Thus, to hold a private corporation liable under § 1983, a plaintiff must establish that the alleged "constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). If a plaintiff provides "no evidence of an unconstitutional policy or custom of [Wexford] itself, [] precedents doom his claim against the corporation." *Id.*

Wexford cannot be held liable simply because it employed the individual medical defendants. And as discussed above, Mr. Garcia did not suffer any constitutional violation with respect to his medical treatment, thus, Wexford cannot be held liable for maintaining an unconstitutional policy or practice. *Id.* at 789. Accordingly, Wexford is entitled to summary judgment as a matter of law.

## IV. <u>CONCLUSION</u>

For these reasons, the Defendants' Motion for Summary Judgment, Dkt. [43], is **GRANTED**, and the Plaintiff's Motion for Summary Judgment, Dkt. [40], is **DENIED**.

Final Judgment consistent with this Order shall now issue.

**SO ORDERED.**

Dated: 9/22/2021

*[signature]*
Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

18

DISTRIBUTION:

Genaro Garcia, #127225
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com